UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

LAWRENCE BILLIMEK,

Defendant.

Case No. 22 Cr. 675 (PGG)

**SENTENCING MEMORANDUM OF LAWRENCE BILLIMEK**

MUKASEY YOUNG LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
Tel: (212) 466-6400

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600

*Attorneys for Lawrence Billimek*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

THE OFFENSE CONDUCT ...............................................................................................1

I.     THE ADVISORY GUIDELINES ANALYSIS.................................................................2
     A.     The Guidelines Calculation Set Forth in the Plea Agreement and PSR ................2

II.    TITLE 18 U.S.C. SECTION 3553(a) FACTORS COUNSEL A MOST LENIENT
     SENTENCE .....................................................................................................................3
     A.     Title 18, Section 3553, Subsection (a)(1) ............................................................4
     Nature and Circumstances of the Offense ...............................................................5
     Lawrence Billimek's History and Characteristics ...................................................5
          1.     Background and Early Life ........................................................5
     B.     Title 18, Section 3553, Subsection (a)(2)(A)......................................................16
          1.     The Prosecution and Its Collateral Consequences Have Already Imposed
                Significant Punishment ...........................................................17
     C.     Title 18, Section 3553, Subsection (a)(2)(B) .....................................................19
          1.     Specific Deterrence ..................................................................19
          2.     The Government Has Already Achieved Adequate
                General Deterrence .................................................................22
     D.     Title 18, Section 3553, Subsection (a)(2)(C)......................................................24
     E.     Title 18, Section 3553, Subsection (a)(2)(D)......................................................25
     F.     Title 18, Section 3553, Subsection (a)(3) ...........................................................25
     G.     Title 18, Section 3553, Subsection (a)(4)(A)......................................................25
     H.     Title 18, Section 3553, Subsection (a)(5) ...........................................................26
     I.     Title 18, Section 3553, Subsection (a)(6) ...........................................................27
     J.     Title 18, Section 3553, Subsection (a)(7) ...........................................................33

CONCLUSION....................................................................................................................33

# TABLE OF AUTHORITIES

**CASES**

*Gall v. United States*,
552 U.S. 38 (2007).................................................................................................. 3, 4

*Kaley v. United States*,
571 U.S. 320 (2014).................................................................................................. 21

*Kimbrough v. United States*,
552 U.S. 85 (2007).................................................................................................... 3

*Pepper v. United States*,
562 U.S. 476 (2011)........................................................................................... 4, 5, 13

*United States v. Emmenegger*,
329 F. Supp. 2d 416 (S.D.N.Y. 2004)...................................................................... 20

*United States v. Adelson*,
441 F. Supp. 2d, 506 (S.D.N.Y. 2006).................................................................... 29

*United States v. Altman*,
48 F.3d 96 (2d Cir. 1995) ........................................................................................ 27

*United States v. Anderson*,
267 F. App'x 847 (11th Cir. 2008) .......................................................................... 17

*United States v. Anderson*,
533 F.3d 623 (8th Cir. 2008) ................................................................................... 17

*United States v. Booker*,
543 U.S. 220 (2005)................................................................................................. 27

*United States v. Bryson*,
229 F.3d 425 (2d Cir. 2000).............................................................................. 4, 16

*United States v. Butler*,
264 F.R.D. 37 (E.D.N.Y. 2010) .............................................................................. 15

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008)...................................................................................... 3

*United States v. Gaind*,
829 F. Supp. 669 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994) ...................... 20

*United States v. Johnson*,
964 F.2d 124 (2d Cir. 1992)...................................................................................... 3

*United States v. Johnson*,
Case No. 16 Cr. 4571 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ....... 24, 28, 32, 33

*United States v. Malik*,
424 F. App'x 122 (3d Cir. 2011) ............................................................................. 18

*United States v. Milikowsky*,
65 F.3d 4 (2d Cir. 1995)............................................................................................ 3

*United States v. Musgrave*,
    647 F. App'x 529 (6th Cir. 2016) ..................................................... 24, 29

*United States v. Olis*,
    Crim. No. H-02-217-01, 2006 WL 2716048 (S.D. Tex. Sept. 22, 2006) ........... 18, 20

*United States v. Ramirez*,
    328 F. App'x 49 (2d Cir. 2009) ............................................................ 13

*United States v. Redemann*,
    295 F.Supp.2d 887 (E.D. Wis. 2003)...................................................... 18

*United States v. Samaras*,
    390 F.Supp.2d 805 (E.D. Wis. 2005)...................................................... 18

*United States v. Sponaugle*,
    Crim. No. 19-103-LPS, 2022 WL 4079197 (D. Del. Sept. 6, 2022) ..................... 17

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009)................................................................. 17

*United States v. Vigil*,
    476 F.Supp.2d 1231 (D.N.M. 2007) ...................................................... 18

*United States v. Zimmerman*,
    No. 10-CR-598 (JG), 2012 WL 3779387 (E.D.N.Y. June 19, 2012) ..................... 13

*Wasman v. United States*,
    468 U.S. 559 (1984)....................................................................... 4

## STATUTES

18 U.S.C. § 3553(a) ........................................................... passim

## OTHER AUTHORITIES

Boss & Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*,
    18 Ohio St. J. Crim. L. 605, 622 (2021) .................................................. 29

Friedman, Nawaday, & Gitner, *Challenging the Guidelines' Loss Table*,
    Federal Sentencing Reporter, Vol. 20, No. 3, Feb. 1, 2008, 2008 WL 2201041 ..................... 21

U.S.S.G. Ch. 1.............................................................................. 27

## PRELIMINARY STATEMENT

This Sentencing Memorandum is respectfully submitted on behalf of defendant Lawrence Billimek, who is scheduled to be sentenced on May 20, 2024.

Larry Billimek is a good and decent man who committed a serious crime.  He accepts complete responsibility for it.  He is ashamed and profoundly remorseful.  He is also determined to learn from it.

Over the past 18 months, Larry has had the opportunity to be still, to reflect, and to reevaluate his life.  He is no longer plagued by anxiety about his finances or insecurity about his family's well-being or his questions about his self-worth.  This case has been an epiphany to him.  Through therapy, study and self-examination, he now recognizes that his family and friends love him unconditionally, and that he never needed to fear alienation or be ashamed of failure.  Larry is on a journey to ethical and moral rehabilitation.  The successful steps he has taken, and will continue to take, demonstrate a commitment to reevaluate his life and change for the better.  A years-long period of incarceration for this first-time, non-violent offender is unnecessary for him to turn his life around and make amends.  He is already doing so.

If true redemption is when guilt leads to good, Larry Billimek is on the right path.  *See The Kite Runner*, Khaled Hosseini (2003).

## THE OFFENSE CONDUCT

On December 14, 2022, Lawrence Billimek and Alan Williams were charged in a three count indictment with participating in a front-running scheme between 2016 and 2022.  ECF No. 1.  As part of the scheme, Larry, a trader employed by TIAA-CREF ("Nuveen"), regularly misappropriated confidential information from his employer about its large, upcoming securities trades that were likely to, and did, affect the stock price of the underlying securities.  *Id.*  He then

provided that confidential trade information to Williams, a retired investment professional, who used it to engage in profitable day trading in the relevant securities. *Id.* at 1 – 2.  In return for the disclosure of this confidential trade information, Williams sent Larry approximately $12 million. *Id.* at 2.

On November 28, 2023, Larry Billimek pleaded guilty to Count Two of the indictment, charging securities fraud, pursuant to a plea agreement.  He admitted the following before this Court:

> From 2016 through about December 2022, I passed material nonpublic information in breach of a duty to my employer, TIAA CREF, to another individual so he could place profitable trades in the stock market. I knew what I was doing was wrong. I'm very sorry for my actions. And I'm here to take responsibility and ask the Court for mercy. (ECF No. 53, Tr. 16:12-17, Change of Plea Hearing Transcript).

He also admitted the forfeiture allegations with respect to Count Two. *Id.* at Tr. 18:25-19:9.

## I.   THE ADVISORY GUIDELINES ANALYSIS

### A.   The Guidelines Calculation Set Forth in the Plea Agreement and PSR

Under the plea agreement, and applying the Guidelines Manual in effect as of November 1, 2023, the parties agreed as follows:

| | |
|---|---|
| Base Offense Level (§ 2B1. 4(a)) | 8 |
| Loss Amount (§ 2B1.4(b)(1) & (§ 2B1.1(b)(1)(L)) | +22 |
| Adjustment for Use of Special Skill (§ 3B1.3) | +2 |
| Reduction for Acceptance of Responsibility (§ 3E1.1(a)) | -2 |
| Reduction for Timely Notice (§ 3E1.1(b)) | -1 |
| Adjustment for Zero-Point Offender (§ 4C1.1) | <u>-2</u> |
| **Total Offense Level** | **27** |

| | |
|---|---|
| **Criminal History Category** | **I** |
| **Advisory Guidelines Range** | **70-87 months** |

The Presentence Investigation Report ("PSR") accepted the parties agreed-upon calculation, set forth above.  PSR ¶¶ 42-52.  Probation recommends a sentence of 70 months.  PSR at 35.

## II.   TITLE 18 U.S.C. SECTION 3553(a) FACTORS COUNSEL A MOST LENIENT SENTENCE

The Sentencing Guidelines mark only the "starting point and initial benchmark at sentencing."  *Kimbrough v. United States*, 552 U.S. 85, 108-9 (2007), citing *Gall v. United States*, 552 U.S. 38, 39 (2007).  Ultimately, sentencing is governed by 18 U.S.C. § 3553(a), which provides, in pertinent part: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553(a)(2), discussed below.

Accordingly, after the Court considers the advisory Guidelines calculation, the Court must proceed to an individualized assessment of the case-specific factors, set forth in section 3553(a), to determine whether, "in [this] particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing."  *Kimbrough*, 552 U.S. 101, quoting 18 U.S.C. § 3553(a).  In making this determination, the Court may consider the applicable Sentencing Guidelines range but must not presume that the sentencing range is reasonable or proper in every case.  The Court must "conduct its own independent review of the [§ 3553(a)] factors, aided by the arguments of the prosecution and defense."  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*).  Furthermore, "the Sentencing Guidelines 'do not require a judge to leave compassion and common sense at the door to the courtroom.'"  *United States v. Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995) (quoting *United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992)).

Title 18 U.S.C. § 3553(a) provides:

The court, in determining the particular sentence to be imposed, shall consider—
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
      (B) afford adequate deterrence to criminal conduct;
      (C) to protect the public from further crimes of the defendant; and
      (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentences and the sentencing range established [under the Sentencing Guidelines] subject to any amendments made to such guidelines by act of Congress…;
(5) any pertinent policy statement . . . issued by the Sentencing Commission . . . subject to any amendments made to such policy statement by an act of Congress…;
(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to the victims of the offense.

## A.      Title 18, Section 3553, Subsection (a)(1)

Title 18 U.S.C. § 3553(a)(1) requires the court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant[.]"  As part of this analysis, a sentencing court must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50 (2007).  "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'"  *Pepper v. United States*, 562 U.S. 476, 488 (2011) (citing *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

In attempting to ensure that the punishment fits the individual defendant, "a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing."  *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000).  Thus, the defendant's "history and

characteristics," the "likelihood that he will engage in future criminal conduct," "his present purposes and tendencies," and "the period of restraint and the kind of discipline that ought to be imposed upon him" are relevant. *Pepper*, 562 U.S. at 492–93 (citations omitted).

**Nature and Circumstances of the Offense**

Larry Billimek acknowledges that the offense of conviction is serious. It extended over six years, implicated millions of dollars, and operated as a fraud and deceit on his employer. TIAA-CREF deserved complete confidentiality and the utmost integrity from those placing securities trades on its behalf. Larry failed in that regard. He knows that his behavior was unacceptable and is deserving of punishment. He has taken full responsibility for his actions and he blames nobody but himself.

Larry is particularly saddened that he let his supervisors and teammates down. The portfolio managers and analysts who trusted him were also betrayed. He wanted so badly to assure financial security for his family, that he completely ignored the cost.

Larry takes a small measure of solace from the fact that he never set out to hurt his employer. Wrong as he was, and contrite as he is, there is no evidence that he was ever motivated by malice, ill will or cruelty to his employer.

The tragic irony here is that Larry Billimek was always fascinated with the markets and he loved being a trader. It was his dream career. Unfortunately, he let his fears and insecurities get the better of him and his dream job eventually came to a nightmare end.

**Lawrence Billimek's History and Characteristics**

      **1.      Background and Early Life**

Larry Billimek was born on April 6, 1971, in Texas City, Texas. His father, Lawrence P. Billimek, Sr., was a forensic accountant for local businesses. His mother, Kathleen Glenn,

worked for life insurance companies.  Larry and his younger brother Jeff primarily grew up in San Antonio, Texas.

Larry's childhood was far from idyllic.  Money was tight and he recalls financial pressures and struggles that led to a tense environment in the home and a rocky relationship between his parents.  According to Larry, his father also struggled with drinking, which created further tension in the household.  Larry reports that his father often aimed his anger at Larry and his little brother and Larry felt the need to protect his younger sibling.  The challenges at home forced Larry, even as a young child, into the role of caretaker and protector, roles that defined him – for better and worse – for the rest of his life.

Without a stable foundation at home, young Larry started getting into trouble.  Around age 13, he began associating with the wrong crowd, and he failed the seventh grade.  A psychologist recommended that he be sent to Medina Children's Home, a boarding school in Medina, Texas.  Although the school provided structure that Larry believed he needed, it was difficult to be away from his family, warts and all, and he particularly worried about his brother. Jeff reflected on the relationship:

> Despite our age difference, Larry and I have always been close. Throughout our childhood, Larry went out of his way to include me in almost everything he did. This was a different experience than lot of my friends with older siblings, and I am extremely grateful to him. Larry was a lot like a father-figure to me growing up. Spending so much time together allowed Larry to share wisdom and taught me a lot of what makes me who I am today.  (Ex. A-5).

His mother Kathleen concurs:

> One of my fondest memories of Larry as a little boy was when his brother Jeff was born. Larry was six years old, and he took it upon himself to be his brother's best friend. He would hold him, comfort him, and play with him. He remains his brother's best friend to this day.  (Ex. A-6).

6

When Larry was a senior in high school, his father filed for bankruptcy. As a result, the bank foreclosed on the family's home, forcing them to move to a small home in a rural community outside of San Antonio. The bankruptcy was very hard on the family and his parents' fighting soon got worse. Shortly after Larry graduated from college, his parents separated, and they later divorced. Larry had long expected the marriage to break up, but he recalls nonetheless being devastated and sobbing uncontrollably when it happened.

The challenges of his formative years produced in Larry a deep-rooted fear of being unable to provide for people he loved, and an anxiety that, without financial security, his own future family unit might disintegrate the way his parents' did. He was determined to build a different – and more stable – life than the one he grew up in. Ultimately, this objective engulfed him and led to his downfall.

\*     \*     \*     \*

Notwithstanding the difficulties in his childhood home, Larry was inducted into the National Honor Society in high school. "Later, he paid for his own college education, and he did well in college." (Ex. A-6). Larry began his undergraduate studies at the University of Texas at San Antonio. He worked hard and studied hard and was able to transfer to the University of Texas at Austin after his sophomore year. Larry eventually put himself through college and pursued a career in finance.

In 1994, Larry started work at Invesco/AIM, where he received his education in trading. His first boss, Ronnie Stein – a lifelong father-figure, mentor, and friend – describes:

> I hired a young Larry Billimek out of the University of Texas in 1994 to work on our equity trading desk at AIM Mutual Funds. As the head of the trading desk, I took a lot of time hiring people because the chemistry of the team was so important, and I wanted to get it right. I was always looking for good people, not just the smartest. I was so excited to hire Larry. He was truly one of my best hires to this day . . . On a professional level, Larry was everything I wanted from an employee.

Larry would arrive early, was so passionate about his first job, and went over and beyond in all of his responsibilities. He was so reliable. Such a people person. He was just a pleasure to have around.  (Ex. A-11).

A former colleague and friend, Gabe Birdsall similarly recalled that "Larry's infectious smile and positive energy were constants in our workplace."  (Ex. A-13).  Gabe added, "[Larry] navigated through the challenges of industry downturns with resilience and optimism, embodying a remarkable sense of humility and authenticity."  (Ex. A-13).

On July 4, 1995, Larry met his future wife, Amy, at a barbeque and they began dating soon thereafter.  Larry was taken with Amy's vivacious personality, keen intellect and solid family background.  Amy described Larry as "funny, charming, thoughtful, sweet, kind and a true Texas boy." (Ex. A-1).  She also made the following observations:

> Larry has always been very driven. . . . I had grown up with a father who put himself through college with a wife and two small children and he worked two jobs. I saw a lot of the same qualities in Larry that I saw in my own father. Larry was determined to have a better life than what he had been given. A life without worrying about money and eventually having a wife and family who he could not only provide for but give his children the experiences he never had.  (Ex. A-1)

Amy and Larry were married in June 1996.  Amy's father wrote to the Court that: "[Larry] has been a loving, faithful, and most supportive husband in actively and joyfully helping Amy to raise their three children who are precious young adults."  (Ex. A-8).  Larry's mother-in-law notes that "[Larry] is a great addition to our family, a son we never had, and a man we knew would care for our daughter."  (Ex. A-9).

In early 1997, Larry left Invesco/AIM and accepted a position in Boston with Numeric Investors, an investment management firm.  The northeast was a big change for Larry and Amy and they struggled to adjust to life in Boston.  Larry left the firm after only a few months and accepted a position as an equity trader with Nicholas-Applegate Capital Management in San Diego, California.

In 1998, while living in San Diego, Larry and Amy decided that they wanted to have children. . In January 2001, twins Tucker and Lily were born.  In January 2003, they welcomed another boy, Callum.

Becoming a father was "Larry's shining moment."  (Ex. A-9).  He felt blessed to have a family of his own and he fully leaned into fatherhood.  His father, Lawrence Billimek, Sr., described that "Lawrence is and has been a devoted husband and loving father to his children. His family is his entire focus."  (Ex. A-7).  His mother-in-law adds, "[f]amily has always been the center of Larry's life, and he has made sacrifices in order to spend as much time with his family as possible." (Ex. A-9).  Amy put it thusly: "I didn't know exactly what my expectations were, but he surpassed everything that I imagined."  (Ex. A-1).  She candidly acknowledges that, "[f]rom the get-go, Larry was the better parent," who was "always hands-on day or night." Family, friends, colleagues, and neighbors agree:

- [Larry] is a great Dad, devoted to his family, and involved in his kids' lives." (Ex. A-6).

- Larry is the fun dad but also is intelligent, thoughtful, caring, and wise. (Ex. A-15).

- Larry has a strong family that he supports. A loving wife, and wonderful children who in turn, support him. (Ex. A-16).

- Larry is a kind family man . . . (Ex. A-20).

- Larry first and foremost is a family man; he treats his wife and children with a tenderness and commitment I have never seen before.  He works very hard to make sure his family and those around him are happy and healthy. (Ex. 19).

- His main concern is for Amy, their kids, and their emotional well-being. (Ex. A-14).

For Larry, three young children – ███████████████████████

██████████ – led to an ever-increasing feeling of pressure to ensure safety and stability for his young family.  Despite the inner turmoil this caused, "[Larry] didn't complain once.  He never shared his worries."  (Ex. A-1).  His only goal in life was to have a loving family of his own that did not have to face the difficulties and disappointments he faced as a child.  "Larry wanted his children to experience travel and adventure, building memories and learning how to overcome challenges. He didn't have quality loving time with his father.  He always sought to give that to our children."  (Ex. A-1).

Notwithstanding his private anxieties, Larry was a strong and supportive father who modeled the right behaviors and values for his children.  To Tucker, Lily, and Callum, Larry is a "role model" and "the provider, the caretaker, the lover, the ever-persevering family man" who has been "a loving and caring father . . . at every stage" of their lives.  Larry passed down to his children the importance of treating others with kindness and respect.  His daughter Lily observed:

> I see how he understands the world and how he treats people and I can't help but feel that I want to be like that. I know my father to be a man of honesty and a paragon of integrity. These traits of his have become a part of me. He has taught me respect, ethics, empathy, compassion, and much more. I find myself with a strong desire to help people just as he does too.  (Ex. A-3).

His son Tucker similarly described, "I have never believed for a moment that my father is anything other than someone who possess a heart of courage and love."  (Ex. A-2).  In addition

to being a dedicated parent, Larry sought to also be an accepting friend to his children.  His daughter Lily described, "[m]y parents raised us to be independent and find our own way, not necessarily imparting their own views on us." (Ex. A-3).

Larry's longtime friends echo these sentiments:

- When my daughter ███████████████ Larry was helpful and supportive and went out of his way to help us in any way possible, and I am forever grateful for his love and support. (Ex. A-5).

- I've always known Larry to be kind, gentle, and humble. He respects other people, regardless of their station in life . . . He is reluctant to say negative things about anyone or anything. (Ex. A-8).

- They were never shy to share a meal, show me around or let me stay with them when I needed to feel connected to family. (Ex. A-10).

- I always appreciated Lawrence's honesty, and he always compensated me promptly after the project was completed. (Ex. A-18).

- Lawrence was very supportive during ██████████████.  He always expressed heart filled encouragement to help me fight and get ahead of life's battles.  I was struggling economically during this time, and Lawrence helped me with small loans that I could work off over time.  Lawrence's support was life changing.  Not for the small amounts of money involved, but for the compassion and trust that I felt with Lawrence.  I am grateful for my friendship with Lawrence, and I am sure we will be friends forever. (Ex. A-18).

- I loved working with Larry, he was always really nice to me and treated me like I was family.  Immediately I knew he was honest and trustworthy and never did anything to make me feel any different. Whenever I needed anything I knew I could rely upon him.  We worked so beautifully together.  I loved working for Larry.  I wish all of the homeowners I worked with were as generous, honest and caring as my friend Larry. (Ex. A-19).

- When you know someone for thirty years, you observe them in many different ways throughout the different phases of their life journey. I saw Larry first as a student, in friendships, and various relationships, then as a husband to his wife Amy, and as a father. All these years later, I still see those same attributes of trustworthiness and thoughtfulness. He gives of himself as a husband, he sacrifices and loves his children, and he has always been a trusted friend to me. (Ex. A-16).

- When I decided to enroll at UT Austin, Larry was the person who showed me around, and introduced me to the person that would hire me for a job I would hold for the next four years.  He set me up with a bike and a PC computer for my dorm.  (Ex. A-10).

Larry and his family remained in San Diego until March 2006 when he was offered a position as a sector head and equity trader with Invesco back home in Texas.  But shortly thereafter, in April 2009, things went awry.

In the aftermath of the financial crisis, Larry was laid off.  Thus began an extremely difficult time for Larry and one that undoubtedly led him down the wrong path.  He had three kids, little in the way of savings, and no income.  He would remain unemployed for two years.  He was not emotionally equipped to handle the strain.  He describes feeling insecure, lacking confidence, and trying to hide his hopelessness, depression and stress from his children.  His worries were exacerbated when losing the family home became a realistic possibility.  Amy began to panic, which caused Larry's stress to multiply.  He was nervous, afraid, and overcome with guilt for having placed his wife, who previously knew nothing but comfort and stability, into economic jeopardy.  Worse than that, he feared that his children might end up in the same troubled circumstances that he experienced as a child.  Larry was scared of losing everything he loved.

In 2011, after a brief stint with a firm in Houston, Larry accepted a position as a senior equity trader for TIAA-CREF at the firm's San Francisco, California office.  Although he was relieved to finally be employed, it was difficult and expensive just to get by in San Francisco.  By 2016, he had maxed out credit cards, borrowed (for a second time) from Amy's parents, and again ended up in dire financial straits.  Determined never to let his wife and kids feel the discomfort, and fearful of losing his ability to provide for them, Larry began a corrupt course of dealing with Alan Williams.

He was terminated from TIAA-CREF in December 2022, following his arrest in this case.

\*       \*       \*       \*

We respectfully submit that Larry Billimek's misconduct stemmed not from sheer greed or covetousness.  Rather, Larry held a misguided belief that, if he failed to provide financial stability to his family, he would lose them, much as his own family unit disintegrated as a child amidst his parents' financial woes.  Of course, Larry was wrong; his wife and children always needed him as their rock and loved him unconditionally.  But in his own mind, Larry's self-worth was inextricably intertwined with his ability to be a provider.  He believed that everything dear to him rested on that.  His criminal activity was propelled not so much by a desire to gain, as by a fear of loss.

\*       \*       \*       \*

"The most up-to-date picture of [a defendant's] history and characteristics" may be found in their post-offense rehabilitation efforts.  *See e.g., Pepper* 562 U.S. at 492 (evidence that defendant took multiple post-conviction steps toward rehabilitation "support[ed] a downward variance" from the advisory Guidelines range); *United States v. Ramirez*, 328 F. App'x 49, 50 (2d Cir. 2009) (taking into account defendant's "significant progress" post-arrest, including extensive rehabilitation efforts); *United States v. Zimmerman*, No. 10-CR-598 (JG), 2012 WL 3779387, at \*6 (E.D.N.Y. June 19, 2012) (Gleeson, J.) (post-arrest rehabilitation warrants a more lenient sentence because a defendant's "awareness of [his] circumstances and the demonstrated willingness to act to achieve rehabilitation, thereby benefitting the individual and society" could warrant a downward departure) (internal citations omitted).

Critical to an understanding of Larry Billimek's history and characteristics is what he has done in the 18 months since his arrest.  He has not been idle, angry, or stagnant.  Instead, he

describes a profound transformation.  He has set out to do better, and be better, through therapy, study and intense self-examination.  He has undertaken the painful process of understanding his bad choices, learning to manage his anxiety, and live with his fears.  Put simply, he is trying to find the "silver linings [that] shine through the fog."  (Ex. A-2).

This is no easy undertaking.  Larry was not raised to discuss feelings or confront emotions or show vulnerability.  "[He] is an introvert and it takes time for him to open up to people."  (Ex. A-1).  That's why "[h]e never really talked about his financial situation."  (Ex. A-10).  But now he is opening up and tackling his fears and depression with a Licensed Professional Counselor ("LPC").  The LPC is coaching him on acknowledging, compartmentalizing, and setting aside anxiety when it occurs.

One of Larry's goals is to understand why the moral compass that guided him through most of his life malfunctioned when it did, as it did.  He thinks anxiety was the cause – not an excuse, but a cause – and he has set about to make sure it never happens again.  He is reconciling the issues that he believes led to his crimes.  For example, Larry is no longer haunted by the misplaced fear that he would fail Amy and the children if he did not provide material support.  He is not fixated any more on the idea that he needs to amass enough money to weather any storm.  He understands now that, unlike his parents' union, his own marriage could survive rough times.  And he finally appreciates that all Amy and his children ever wanted was for him to be loving and present and a dad; the pressure to "produce" was self-imposed.  He has found a degree of serenity and clarity that were missing from his life.

Amy is fully supportive of Larry's efforts and the LPC helps the couple manage anxiety as a unit.  She recognizes the progress, observing that "our children have developed a new

connection . . . with their father . . . because of what has happened. It is a beautiful thing to see."
(Ex. A-1). Larry, as always, is succinct. He calls the therapy a lifesaver.

Larry is supplementing his therapy with books that have forced him to look at himself in
the mirror, be accountable, and find peace by conquering fear. He informs that among the books
he has found useful are "*Man's Search for Meaning*" by Viktor Frankl, a seminal book about
finding hope in times of great despair; "*Courage is Calling*" by Ryan Holiday, about the courage
of leaders including Charles De Gaulle, Florence Nightingale, and Dr. Martin Luther King Jr.;
and "*As a Man Thinketh*," James Allen's book on the power of thought. He is now better able to
express his feelings, "take[] responsibility for what he did," and "rebuild[]." (Ex. A-10). Larry
also hopes to be able to share his story with others in the industry in the hopes they may find it
meaningful.

It should also be noted that in the spirit of turning things around, Larry met with
prosecutors and federal agents in an attempt to cooperate with the government. We are informed
that although the government indicated they were not likely to pursue any of the issues that were
discussed, they found Larry to be credible.

Caselaw recognizes that in addition to a defendant's own reconstructive efforts, "a strong
supportive network of extended family, friends, teachers, and potential employers . . . indicate a
high probability of rehabilitation." *United States v. Butler*, 264 F.R.D. 37, 38 (E.D.N.Y. 2010).
Larry has precisely the kind of "network" that has continued to support him even in the face of
the current charges:

- "Lawrence's support ██████████████ was life changing . . . I pray
  for leniency for my good-hearted friend." (Ex. A-18).

- "I ask the Court to take leniency on Larry given his good character and kind
  heart." (Ex. A-20).

15

- "[H]is character and the value he has shared with the world are notable." (Ex. A-15).

- "I wouldn't write this letter and put my name on the line for someone of low character" (Ex. A-16).

Larry's friend of 30 years, Walter Hutcherson, tells a remarkable story of Larry's "love and grace:"



I doubt that he knows how much that moment meant to me.  I remember walking back to my hotel thinking, "I can do this," and I did.  (Ex. A-14).

*      *      *      *

Larry is well aware that he cannot make amends for his crimes simply through therapy, self-examination and a community of supporters.  But "a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *Bryson*, 229 F.3d at 426 . When Larry Billimek appears on the day of sentencing, he will be a man taking meaningful steps to learn hard lessons, and who now sees his life in a whole new light.

**B.      Title 18, Section 3553, Subsection (a)(2)(A)**

Subsection (a)(2)(A) provides that the court shall consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  Larry has undoubtedly suffered significant and substantial punishment for this offense, and will continue to be punished, even without a long

16

term of imprisonment.  A most lenient sentence, therefore, would not unduly depreciate the seriousness of the offense or promote disrespect for the law.  On the contrary, a most lenient sentence would impose a sufficient – indeed, a just – punishment.

### 1. The Prosecution and Its Collateral Consequences Have Already Imposed Significant Punishment

A court, when imposing sentence, should consider the collateral consequences of the defendant's conviction.  Indeed, "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009).

After a 28-year career in the financial services industry, Larry has lost a job he loved and the only livelihood he has ever known.  This was a crushing blow.  Furthermore, following Larry's arrest, news of his indictment was published nationwide.  It appeared in mainstream media, featured prominently in financial news sources including Bloomberg, Reuters, *The Wall Street Journal*, *Financial Times*, *Craine's Business*, and *Barron's*.  These articles will remain on the internet forever, punishing Larry for the rest of his life.  His reputation is in tatters, and it is unlikely that he will ever again work in the industry.  On top of it all, in addition to this criminal case, an SEC case is pending against him.  *See SEC v. Billimek et. al.*, Case No. 22-CV-10542 (JHR) (S.D.N.Y.).  Courts around the country have recognized these kinds of consequences as punishment and take factors like this into account at sentencing.[1]

---

[1] *See, e.g.*, *United States v. Sponaugle*, Crim. No. 19-103-LPS, 2022 WL 4079197, at *6-7 (D. Del. Sept. 6, 2022) (identifying "significant punitive components" of non-custodial sentence, including financial punishment, collateral consequences of "greatly reduced job prospects" and impact on the defendant's reputation); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (upholding below-Guidelines sentence in part because district court found that "defendant had suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming a below-Guidelines sentence in part because defendant lost his job and income); *United States v. Jasen*, 15-CR-00214 (M.D. Fla. Jan. 28, 2016), Dkt. No. 86 at 53-54 (imposing probation because, in part, "one who makes a mistake in judgment...should be, in my judgment, absent other aggravating circumstances, be able to go on with their life and suffer the humiliating and devastating

Notwithstanding Larry's rehabilitative efforts, this prosecution has still visited difficult times on the family.  In the aftermath of his arrest, his wife Amy, ███████████████████ ██████████████████.  Tucker Billimek's partner Matthew Centeno observed that "[t]he criminal case has turned the Billimeks' world upside down.  It has been a scary, unpredictable time for the family."  (Ex. A-15)  Similarly, Larry's cousin John wrote that he "could sense deep shame [in Larry] and remorse over what he did."  (Ex. A-10)  Family friend Meagan Bignall described:

> I learned about Larry's current situation during his most recent visit to San Antonio in January 2024. I listened to Amy tell me how their world has been spun upside down, ████████████████████████, and how the children are trying to cope. They lost friendships during the time they needed help the most. They were not themselves when I saw them. I could feel the fear and sadness that consumes them. You can see it on their faces. They looked tired, unrested. I was also struck by how thin Larry has gotten. It felt to me as if all of his joy had been sucked out of him. (Ex. A-20).

Larry has no prior criminal history.  Therefore, the very status of "convicted felon" delivers a significant blow and inflicts a major punishment.  Larry will also suffer the harsh "collateral consequences" of a felony conviction, under both state and federal law.  A felony conviction will hinder everything "from opening a brokerage account to coaching [a children's]

---

effects of being prosecuted...which will... harm your reputation, your social status..."); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming a below-Guidelines sentence in part because the defendant "was punished by the reputational harm he suffered as a result of the criminal action"); *United States v. Redemann*, 295 F.Supp.2d 887, 894–97 (E.D. Wis. 2003) (downward departure warranted where defendant suffered serious collateral consequences from conviction); *United States v. Samaras*, 390 F.Supp.2d 805, 809 (E.D. Wis. 2005) (imposing below-Guideline sentence in part because, "as a consequence of his conviction and sentence, defendant lost a good public-sector job, a factor not considered by the Guidelines."); *United States v. Anghaie*, 09-CR-0037 (N.D. Fla. Nov. 29, 2011), Dkt. No. 238 (imposing below-Guidelines sentence and noting that defendants "received significant punishment through financial loss, loss to reputation and career opportunities."); *United States v. Vigil*, 476 F.Supp.2d 1231, 1315 (D.N.M. 2007) (observing that, in considering justness of sentence, "it is important to consider all other forms of punishment [defendant] has already suffered," including loss of job and damage to his personal and professional reputation); *United States v. Olis*, Crim. No. H-02-217-01, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (finding a substantial variance warranted in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct").

soccer team."[2]  He will likely lose the right to own a firearm—a serious deprivation for an avid

outdoorsman—to vote, to hold office, to sit on a jury and to obtain professional licenses.   The

Council of State Governments Justice Center puts it as follows:

> Collateral consequences remain obscure and are increasingly complex. Because collateral consequences are civil in nature—and not part of a person's criminal punishment—they are generally imposed without the involvement of sentencing courts and are not referenced alongside the state and federal laws that govern criminal offenses or procedure. Instead, they are scattered throughout various portions of state statutory and regulatory codes, making it difficult for a person to identify all of the consequences that may stem from a conviction for a particular crime in a particular jurisdiction. In a single state, employment barriers may be embedded in a state's civil service code, trade and occupations code, and any other place that regulates business practices. And because collateral consequences are not criminal, they are generally implemented by state agencies through obscure and often complex administrative policies and internal practices that may drastically alter their operation and impact.[3]

Furthermore, "[i]n many states, a criminal record is a stain you can't wash off."[4]

Put simply, a host of sanctions, disqualifications and difficulties will follow Larry for the

rest of his life.

### C.    Title 18, Section 3553, Subsection (a)(2)(B)

Section 3553(a)(2)(B) provides that an appropriate sentence should "afford adequate

deterrence to criminal conduct[.]"

#### 1.    Specific Deterrence

This prosecution has indisputably achieved specific deterrence.  As discussed above, after

a 28-year career, Larry will likely never work in the financial services industry ever again.  He

---

[2] Evan Osnos, *Life After White-Collar Crime*, The New Yorker (Aug. 23, 2021), https://www.newyorker.com/magazine/2021/08/30/life-after-white-collar-crime.
[3] Chidi Umez & Joshua Gaines, After the Sentence, More Consequences: A National Report of Barriers to Work, Council of State Governments Justice Center (Jan. 2021), https://csgjusticecenter.org/wp-content/uploads/2021/02/collateral-consequences-national-report.pdf.
[4] Stephen Slivinski, Economist, Center for the Study of Economic Liberty at Arizona State University, Council of State Governments Justice Center, https://csgjusticecenter.org/publications/the-national-inventory-of-collateral-consequences-of-conviction/#:~:text=In%20many%20states%2C%20a%20criminal,to%20use%20it%20against%20you.

will never again be an "insider" so the conditions that led to this case are unlikely to arise again.

*See, e.g., United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (defendant

"yielded to a temptation and committed a crime particularly adapted to his chosen career. That

career is over, and his potential to commit this particular type of crime has been eliminated.").

Larry, moreover, is keenly and painfully aware that through conduct that was intended to

provide for his family, he has inadvertently caused more difficulties for the people he loves.

These are pains, profoundly felt, that Larry never wants to suffer, or inflict, again.

Under these circumstances, there is no reason whatsoever to believe that Larry will

reoffend.[5]  The criminal law has therefore already achieved its deterrence objective.  *See, e.g.,*

*United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) ("Elimination of the defendant's

ability to engage in similar or related activities—or indeed any major business activity—for

some time . . . constitutes a source of both individual and general deterrence[]"), *aff'd*, 31 F.3d

73 (2d Cir. 1994); *Olis*, 2006 WL 2716048, at *13 (substantial variance warranted in part

because "the attendant negative publicity, the loss of his job and accounting and law licenses,

and the need to provide support for his family will provide adequate deterrence against any

potential future criminal conduct.").

---

[5] The PSR in its justification for recommending a sentence of 70 months' imprisonment identified "concerns regarding Billimek's forthrightness as to the disclosure of his financial information." PSR at 36.  In support of those concerns, the PSR notes that Mr. Billimek initially provided a "Statement of Worth" document that was unsigned and dated.  *Id.*  We are told that to assist and simplify the financial disclosure, Mr. Billimek provided an Excel spreadsheet that contained the information requested in the financial disclosure form.  Mr. Billimek subsequently provided a signed signature page to the financial disclosure.  The PSR also notes that there were two properties that were not disclosed.  *Id.*  We are told the following regarding the entities identified: (1) Ahi Aku LLC: this was a business holding company for a rental real estate property 4405 Aku Road Hanalei, HI that Mr. Billimek sold in April 2023.  The business holding company was created for liability purposes.  The sale of the property was disclosed on the financial disclosure as an asset that had been transferred or sold; (2) 5-7320 Kuhio Highway Trust: this was a trust that was created to hold a real estate property that Mr. Billimek sold in 2021. This trust was created for liability purposes.  The funds from the sale were used towards the purchase of 181 Hyndman View Drive.  This property was disclosed to Probation.  The PSR also suggests that the shortfall between Mr. Billimek's monthly expenses and income "may create a negative impact upon the defendant that increases his risk of recidivism."  *Id.*  There is no reason to believe that Mr. Billimek is likely to re-offend because he continues to have living expenses and currently has limited income.

Offenders with no criminal history, like Larry, are the least likely to re-offend.  And offenders with a college education are less likely to recidivate.[6]  In the words of Daniel Gitner, now Chief of the S.D.N.Y.'s Criminal Division:

> [L]ong sentences often are not required to deter recidivism among business fraud offenders. White-collar offenders ... often become involved in illegal conduct as a result of their position within a legitimate enterprise or in the context of a legitimate financial relationship with others. That position or relationship is often destroyed, as is the ability to forge new ones, through the felony conviction alone. Similarly, research shows that the threat of short prison terms has a significant deterrent effect on the typical white-collar would be criminal.[7]

Finally, criminal forfeiture is a punitive measure and serves as a specific deterrent.  *See Kaley v. United States*, 571 U.S. 320, 323 (2014) ("Forfeitures… at once punish wrongdoing, deter future illegality, and 'lessen the economic power' of criminal enterprises") (citations omitted).  Larry has admitted to the forfeiture allegations with respect to Count Two of the Indictment and has agreed to forfeit the specified property in the Plea Agreement, and the Consented to Preliminary Order of Forfeiture as to Specific Property/Money Judgment.  ECF No. 52.  To that end, Larry has been working to sell the properties identified in the Preliminary Order of Forfeiture as quickly as possible.  As of the filing of this memorandum, the real property at 1903 Eva Street, Austin, Texas, ECF No. 52 at 2 ¶ (e), is currently under contract.  The purchase price for the property was $1.5 million.  The real property at 147 Magnolia Drive, San Antonio, Texas, ECF No. 52 at 2 ¶ (h), with the consent of the government, will be purchased by a family member for $550,000.

In sum, Larry Billimek does not present a risk of committing further crimes.

---

[6] *See* U.S. Sent. Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* 18-24 (March 2016), https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview.

[7] Gabrielle S. Friedman, Kan M. Nawaday, & Daniel M. Gitner, *Challenging the Guidelines' Loss Table*, Federal Sentencing Reporter, Volume 20, Number 3, February 1, 2008, 2008 WL 2201041, at *178 (internal citations omitted).

### 2.     The Government Has Already Achieved Adequate General Deterrence

The government, through its investigation and highly publicized prosecution, has surely achieved adequate general deterrence of the conduct of conviction.  In the wake of Larry's arrest, indictment, and guilty plea, the Court can reasonably conclude that Larry's downfall is known to all – and certainly to the financial services community – and all are aware of the offending conduct and potential punishment.

In a publication by the National Institute of Justice ("NIJ")—the research, development, and evaluation agency of the U.S. Department of Justice—the NIJ summarized that "increasing the severity of punishment does little to deter crime." [8]  Certainty has a greater impact on deterrence than severity of punishment.  *Severity* refers to the length of a sentence.  Studies show that for most individuals convicted of a crime, short to moderate prison sentences may be a deterrent but longer prison terms produce only a limited deterrent effect.  In addition, the crime prevention benefit of long sentences falls far short of the social and economic costs.

*Certainty* refers to the likelihood of being caught and punished for the commission of a crime.  Research underscores the more significant role that certainty plays in deterrence than severity—it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment.  Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration.

The message of certainty has been made loud and clear in this case.  The U.S. Attorney's Office issued press releases on the date of the arrest and on the day of the guilty plea using

---

[8] National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf.

pointed, sharp rhetoric warning the public against these types of crimes: (U.S. Attorney Damian Williams: "For more than five years, Lawrence Billimek abused his trusted position in a major financial services organization to illicitly generate tens of millions of dollars in profits through insider trading. Billimek knew his actions were wrong, using burner phones and lies to try to cover his scheme, but he continued to undermine the integrity of the market anyway. Insider trading is a serious crime, and Billimek now faces substantial prison time.").[9]

Furthermore, according to a corresponding SEC press release, "the SEC staff analyzed trading using the Consolidated Audit Trail ("CAT") database to uncover Williams' allegedly fraudulent trading and to identify how he profited by repeatedly front-running large trades by Billimek's employer" which resulted in this prosecution.[10] CAT, which the former-SEC Commissioner Kara Stein dubbed "the Hubble Telescope for the securities markets," is a "regulatory central database for every trade order, execution, modification and cancellation, as mandated by the SEC."[11] At the time of Larry's arrest, it was reported far and wide that this matter could be the first case to be explicitly attributed to the CAT.[12] Thus, the news about this case and this new powerful tool being deployed by the SEC in itself, provides an extra level of general deterrence.

---

[9] Press Release, Dep't of Justice, *Former Insider At Major Financial Services Organization Admits Involvement In Multimillion-Dollar Insider Trading Ring* (Nov. 28, 2023), https://www.justice.gov/usao-sdny/pr/former-insider-major-financial-services-organization-admits-involvement-multimillion; *see also* Press Release, Dep't of Justice, *Insider at Major Financial Services Organization and Retired Financial Professional Charged With Multimillion Dollar Front-Running Scheme* (Dec. 14, 2022), https://www.justice.gov/usao-sdny/pr/insider-major-financial-services-organization-and-retired-financial-professional.
[10] Press Release, SEC, *SEC Charges Financial Services Professional and Associate in $47 Million Front-Running Scheme* (Dec. 14, 2022), https://www.sec.gov/news/press-release/2022-228.
[11] John McCrank, *SEC approves 'Hubble Telescope' for Securities Markets*, Reuters (Nov. 15, 2016), https://www.reuters.com/article/us-sec-regulations-cat-idUSKBN13A2S9/
[12] Robin Wiggles, *CAT Got The Cream*, Financial Times (Dec. 15, 2022), https://www.ft.com/content/0258ee16-d123-47c2-b679-f16d5dd618c6.

A sentence well below the advisory Guidelines range can still achieve the objective of general deterrence.  As Judge Garaufis commented in *United States v. Johnson*, "any amount of prison time is a serious amount of prison time[]" and therefore even a lenient sentence, "combined with the expense and emotional harm that have resulted from this prosecution, and the disgrace of having been convicted of a felony, should be sufficient . . . to effect general deterrence." *United States v. Johnson*, Case No. 16 Cr. 4571 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) (24-month sentence for Guidelines range of 87-108 months).  *See also United States v. Martoma*, Case No. 12 Cr. 973 (PGG) (S.D.N.Y. Sept. 17, 2014), ECF No. 318 (Hearing Transcript), at 41-43 (nine-year sentence sufficient for insider trading scheme that generated $275 million in profits and $9 million bonus for defendant with Guidelines range of 188 to 235 months).

In sum, the public is undoubtedly aware, warned, reacting, and more than adequately deterred.  *See e.g., United States v. Musgrave*, 647 F. App'x 529, 534 (6th Cir. 2016) (sentence of supervised release joined with home confinement and a severe financial penalty, though not imprisonment, afforded adequate general deterrence where defendant was convicted of bank fraud and wire fraud).

### D.   Title 18, Section 3553, Subsection (a)(2)(C)

Section 3553(a)(2)(C) sets forth that an appropriate sentence shall "protect the public from further crimes of the defendant."  There is no indication that Lawrence will commit further crimes or that the public needs protection from him.  Larry has also faithfully abided by the conditions of his pretrial supervision since his arrest on December 22, 2022.  *See* PSR ¶ 8.

### E.   Title 18, Section 3553, Subsection (a)(2)(D)

Section 3553(a)(2)(D) provides that courts shall consider "the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]"  Larry needs no further education or training.  He has no history of mental health issues or substance abuse.  He does not need any correctional treatment.  As discussed above, in the wake of his arrest, Larry has made significant efforts towards rehabilitation.  A long term of incarceration is not necessary to further any rehabilitative efforts that have already begun.

### F.   Title 18, Section 3553, Subsection (a)(3)

Subsection 3553(a)(3) provides that courts shall consider "the kinds of sentences available."  Here, the PSR sets forth in detail the kinds of sentences available in this case.  *See* PSR ¶¶ 107-122.  As urged elsewhere in this memorandum, the Court should impose a most lenient sentence in this case.

The applicable statutes authorize the imposition of a fine, in an amount up to $5,000,000. The PSR, however, recommends against the imposition of a fine.  *See* PSR at 35; 41. ("[b]ased on available information, including the expected restitution amount, the defendant's reported financial resources, and familial obligations, he does not appear able to remit a fine. Thus, no fine is recommended.").  Larry respectfully urges the Court to follow that recommendation and not impose a fine.

### G.   Title 18, Section 3553, Subsection (a)(4)(A)

Section 3553(a)(4)(A) provides that courts shall consider "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]"  This memorandum discusses

the advisory Guidelines, above.  Larry respectfully directs the Court's attention to that discussion.

**H.**      **Title 18, Section 3553, Subsection (a)(5)**

Section 3553(a)(5) provides that courts shall consider any "pertinent policy statements" of the Sentencing Commission.  The Court should therefore consider the "pertinent policy statements" cited in the discussion of the sentencing guidelines in this memorandum.

The Guidelines calculation set forth in the plea agreement and PSR applies the so-called zero-point offender adjustment.  The Sentencing Commission's data shows that zero-point offenders "have considerably lower recidivism rates than other offenders, including lower recidivism rates than the offenders in Criminal History Category I with one criminal history point." U.S.S.G. Manual, Amendment 821 (eff. 11/1/2023), at "Reason for Amendment" (*available at* https://www.ussc.gov/guidelines/amendment/821) (citation omitted).  In short, the criminal justice system generally has no need or reason to imprison the zero-point offender because he or she—like Larry—is so unlikely to reoffend.

Proposed amended Commentary—specifically, a new Application Note 10(A) to § 5C1.1—drives home the Commission's view that zero-point offenders, who would qualify for an adjustment under § 4C1.1(a), generally need not go to prison.  That new Application Note provides: "If the defendant received an adjustment under § 4C1.1 . . . and the defendant's applicable guideline range is in Zone A or B . . . a sentence other than a sentence of imprisonment, in accordance with subsection . . . (c)(3), is generally appropriate."  Furthermore, Application Note 10(B) to § 5C1.1 provides: "A departure, including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under § 4C1.1 . . . and the defendant's applicable guideline range overstates the

gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense."

### I.        Title 18, Section 3553, Subsection(a)(6)

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"  Because fraud is a crime of infinite variety, *see generally United States v. Altman*, 48 F.3d 96, 101 (2d Cir. 1995), it presents particular challenges for sentencing courts striving to achieve proportionality in sentencing while reducing unwarranted disparity, *see generally* U.S.S.G. Ch. 1, pt. A.3 (identifying reduced disparity and proportionality based on the severity of the offense as two key goals of the Sentencing Reform Act of 1984, 18 U.S.C. § 3551 *et seq.*); *United States v. Booker*, 543 U.S. 220, 264 (2005) (explaining that post-*Booker* sentencing contemplates consideration of Guidelines to serve goals of "avoiding unwarranted sentencing disparities" and "proportionality").

On this issue, the PSR normally sets forth information from the U.S. Sentencing Commission's Judiciary Sentencing Information ("JSIN") database.  But here, the JSIN database provides that there was an insufficient number of defendants (1) whose primary guideline was §2B1.4, with a Final Offense Level of 27 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure; and (2) who received a sentence of imprisonment in whole or in part for FY 2023.[13]  PSR at 30.

Although the JSIN does not have adequate data for defendants with a Final Offense Level of 27, it does have data for defendants *just one level below.*  Thus, for defendants whose primary

---

[13] Since the U.S. Probation Office issued the Final PSR, the U.S. Sentencing Commissions JSIN database has been updated to include data from FY 2023.  The discussion above, therefore, adopts the updated JSIN data.

Guideline was § 2B1.4, with a final Offense Level of 26 and a Criminal History Category of I,

the JSIN database provides as follows:

> During the last five fiscal years (FY2019-2023), there were 3 defendants whose primary guideline was §2B1.4, with a Final Offense Level of 26 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 3 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 17 month(s) and the median length of imprisonment imposed was 12 month(s). For all 3 defendants in the cell, the average sentence imposed was 20 month(s) and the median sentence imposed was 12 month(s).

This result from the JSIN database is attached as Ex. B.

*     *     *     *

Over the last thirty years, sentences for offenses under § 2B1.4 in the Second Circuit

have ranged from probation to 132 months.  The driving force for the Guideline calculation is

often the economic loss under § 2B1.1.  Based on the disproportionately severe sentences that

result from the economic loss Guidelines, courts routinely conclude that these Guidelines do not

serve as a reliable benchmark for culpability, and issue sentences well below the Guidelines

range. *See e.g., Johnson*, 2018 WL 1997975, at *3-4 (criticizing loss enhancement as a "grievous

wrong" and imposing 24-month sentence following downward variance from Guidelines range

of 87-108 months); *United States v. Milton*, Case No. 21-cr-478-ER, ECF No. 327 (Judgment)

(S.D.N.Y. Jan. 17, 2024) and Sentencing Tr. at 25:16-26:3 (ECF No. 322) (S.D.N.Y. Dec. 18,

2023) (48-month sentence for defendant with offense level of 41 and Guidelines range of 324 to

405 months); *United States v. Scott*, Case No. 17-cr-630-ER, ECF Nos. 607 (Gov't. Sentencing

Memorandum) and 611 (Judgment) (S.D.N.Y. 2024) (120-month sentence for lawyer who

laundered $400 million in fraud proceeds and received $50 million in payments despite

Guidelines range of 600 months); *United States v. Adelson*, 441 F. Supp. 2d, 506, 512 (S.D.N.Y.

2006) (imposing 42-month sentence for defendant with offense level of 46 and describing "the

28

utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"). *See also Musgrave*, 647 F. App'x at 530, 538 (affirming downward variance for defendant with offense level of 25 and a $1.7 million loss to a sentence of one day of imprisonment, reasoning that "because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances.").

The Interactive Data Analyzer shows that judges are more likely to vary below the Guideline range in § 2B1.4 cases than the average federal criminal case.[14]  Courts appear to depart or vary below the Guidelines in the majority of cases applying a § 2B1.1 loss enhancement.  For example, from 2015 through 2019, more than 50 percent of sentences issued to fraud offenders were below the Guideline range.  *See* Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18 Ohio St. J. Crim. L. 605, 622 (2021).

Out of the many insider-trading sentences in the Second Circuit, three merit further discussion:

The Court should resist the temptation to compare this case to *United States v. Mathew Martoma*, 12-CR-973 (PGG) (S.D.N.Y.).  In 2014, as this Court knows better than anyone, Mathew Martoma was convicted after a jury trial of one count of conspiracy to commit securities fraud and two counts of securities fraud.  ECF No. 230.  Martoma's Offense Level was 36, his Criminal History Category I, and his recommended Guidelines range was 188-235 months.  ECF No. 318, Tr. 11:23-12:3.  As described by the government in its sentencing memorandum:

---

[14] *Interactive Data Analyzer*, U.S. SENT'G COMM'N, https://ida.ussc.gov

> Martoma was the central figure in the most lucrative insider trading scheme ever charged. Over a period of approximately 18 months, the defendant cultivated and corrupted two doctors legally bound to guard confidential information concerning a high-profile drug trial, ultimately obtaining an advance preview of the highly anticipated public announcement of the results. Martoma caused approximately $750 million worth of Elan and Wyeth securities to be traded based on this illegal inside information, netting profits and avoiding losses of $275 million for SAC Capital and, as a direct result, a $9.3 million bonus for himself.

ECF No. 293 at 1.  The Court sentenced him to nine years in prison.  ECF No. 318, Tr. 43:8-9.

Of course, Martoma's conduct featured numerous aggravating factors that are not present here, most notably the sheer size of the insider trading scheme.  Furthermore, the two defendants could not be more different individuals.  As this Court remarked at sentencing, Martoma's conduct throughout his life reflected a "common thread[,] the unwillingness to accept anything other than the top grade, the best school, the highest bonus, and the willingness to do whatever it takes to accomplish that result."  ECF No. 318, Tr. 41:8-13.  "His father [was] an engineer by training, while his mother [was] a physician.  He wanted for nothing growing up."  *Id.* at Tr. 33:21.  Despite being afforded every privilege in life, Martoma turned to deceit in a never-ending quest for prestige, including lying about being expelled from Harvard Law School to be admitted into Stanford Business School.  *Id.* at Tr. 34:6-9.  Larry Billimek could not be more different.

The conduct here could also, at first glance, be compared to the "Billy" Walters insider trading case.  *United States v. William T. Walters*, S1 16-CR-338 (PKC) (S.D.N.Y.).  Walters was an extremely wealthy professional gambler.  As described by the government in its sentencing memorandum in that case:

> From 2006 to 2013, Walters masterminded an insider-trading scheme that benefited Walters—and Walters alone—by over $45 million in profits made and losses avoided. Time and again, quarter after quarter, Walters exploited his corrupt relationship with Thomas C. Davis, who sat on the board of Dean Foods Co. ("Dean Foods") and was privy to all manner of its corporate secrets. Davis was undoubtedly an eager participant in the scheme. But only Walters knew the extraordinary magnitude of his illicit trading activity, which at one point included a single

position in Dean Foods stock worth over $100 million. In so doing, Walters became an emblematic confirmation of an all too common fear: that the stock market is rigged against average investors by a network of crooked insiders, eager to trade market windfalls for favors. Unrepentant in his wrongdoing, Walters engaged in grave, sustained criminal conduct that was singular in its purpose—to make a rich man richer.

ECF No. 195 at 1.

At sentencing, the Court found that the applicable offense level was 30 which resulted in a guidelines range of 97 to 121 months' imprisonment. ECF No. 206, Tr. 13:14-18. The probation department recommended a sentence of 366 days' imprisonment. *Id.* at Tr. 13:17-20. The government requested a sentence within the applicable guidelines range. ECF No. 195 at 26. The Court sentenced Walters to a term of 60 months' imprisonment.[15] Larry Billimek's Guidelines calculation and the 70-month recommendation in the PSR *would have him serve a longer sentence* than Walters even though the personal profit pales in comparison and Walters did not "express remorse" and was not "chastened by [the] process." ECF No. 206, Tr. 27. The Court should not sanction such an unjust result.

Larry also will appear before this Court in a completely different posture than Martoma or Walters which strongly counsels leniency and a greater variance than those defendants received. Larry did not go to trial. He accepted full responsibility for his actions. He is rehabilitating. Unlike Martoma and Walters, he was not a person of privilege who committed crimes out of sheer avarice or a need to "win." He was a not a rich man who sought to be richer or a gambler looking for a windfall. We respectfully submit that Larry *did corrupt things* to try to alleviate his fears, but he never *became a corrupted person*. A significant variance is

---

[15] Press Release, Dep't of Justice, *William T. "Billy" Walters Sentenced In Manhattan Federal Court for $43 Million Insider Trading Scheme* (July 27, 2017), https://www.justice.gov/usao-sdny/pr/william-t-billy-walters-sentenced-manhattan-federal-court-43-million-insider-trading.

appropriate because Larry is so much more than the sum of his bad acts, and because of the

extraordinary kindness he has shown others throughout his life.

The crushing effect of the economic loss Guideline in this case strongly counsels the

leniency that was shown by the court in *United States v. Johnson*, Case No. 16-CR-457 (NGG)

(E.D.N.Y.).  In *Johnson*, the former head of HSBC's Global Foreign Exchange cash trading

engaged in a front-running scheme which exploited confidential information from his employer

and betrayed a client in order to generate profits for HSBC and enrich himself.[16]  As described

by the government, "after using this confidential information for his own benefit and that of his

bank, Johnson and his colleagues offered their client a series of lies about how they executed the

transaction in question. Johnson's crime not only caused a financial loss to his client, but also

caused a disruption in the rate at which the British Pound traded against the U.S. Dollar, thereby

having a financial impact on countless businesses and consumers and undermining the public's

confidence in the integrity of the foreign exchange ("FX") markets."  ECF No. 217 at 3.

Judge Garaufis agreed with the Probation Department that the applicable offense level

was 29, yielding an applicable guidelines range of 87-108 months' imprisonment.  *Johnson*,

2018 WL 1997975, at *1 .  Yet, the Court imposed a sentence of 24 months' imprisonment.  *Id.*

at *4.  Judge Garaufis noted what many other courts were recognizing to be a fundamental flaw

in the Guidelines. "[T]he Sentencing Commission's loss-enhancement numbers do not result

from any reasoned determination of how the punishment can best fit the crime, nor any

approximation of the moral seriousness of the crime.  *Id.* at *3.  Indeed, "[g]iven the feeble

underpinnings of the loss enhancement, it is particularly galling that this factor is often more or

---

[16] Press Release, Dep't of Justice, *Former Head of HSBC's Global Foreign Exchange Cash Trading Sentenced to 24 Months' Imprisonment for Front-Running Scheme* (Apr. 26, 2018), https://www.justice.gov/usao-edny/pr/former-head-hsbc-s-global-foreign-exchange-cash-trading-sentenced-24-months.

less <u>solely</u> responsible for a white-collar offender's Guidelines sentence." *Id.* "Because the defendant's Guidelines sentence of 87-108 months" was "overwhelmingly due to the loss enhancement, and because I would find such a sentence well out of proportion to his appropriate sentence" the Court looked "closely at the § 3553 factors" for guidance to a reasonable sentence. *Id.* at *4.

> **J.**    **Title 18, Section 3553, Subsection(a)(7)**

Section 3553(a)(7) provides that the court shall consider "the need to provide restitution to any victims of the offense."

Pursuant to the plea agreement, Larry agreed to make restitution in an amount ordered by the Court in accordance with 18 U.S.C. §§ 3663, 3663A, and 3664. The amount is not fixed in the plea agreement. The defense is reviewing TIAA-CREFF's Victim Impact Statement, which seeks to hold Larry responsible for $38,432,621.62, and respectfully requests an opportunity to supplement this memorandum as necessary on this very complicated restitution issue. The defense may request that the government seek from the Court an additional 90-day period authorized by § 3664 to determine the ascertainable victim losses, if any.

<b>CONCLUSION</b>

The Honorable John S. Martin, a former Southern District Judge and United States Attorney, recently addressed "the overly long sentences that are being imposed every day in our federal courts on nonviolent offenders."[17] He wrote that "[w]e have lost all sense of how horrible it is to spend even one year in prison, far away from family and friends, where every moment of existence must be lived under prescribed rules enforced by people who do not respect

---

[17] John S. Martin, *Cruel But Not Unusual: The Sentence Recommended for Sam Bankman-Fried*, New York Law Journal (Mar. 12, 2024), https://www.law.com/newyorklawjournal/2024/03/12/cruel-but-not-unusual-the-sentencerecommended-for-sam-bankman-fried/.

you and whom you do not respect and under constant fear of an unprovoked attack by another inmate." *Id.*

The PSR's recommendation of 5 years and 10 months' imprisonment is far greater than necessary to achieve the purposes of sentencing in this matter.

For the foregoing reasons, Lawrence Billimek respectfully requests that the court impose a most lenient sentence.

Dated: May 6, 2024
New York, New York

Respectfully submitted,

 /s/ Marc L. Mukasey
Marc L. Mukasey
Stephanie Guaba
MUKASEY YOUNG LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
Tel: (212) 466-6400
Email: marc.mukasey@mukaseylaw.com

Telemachus P. Kasulis
Courtney D. Morphet
MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
Tel: (212) 880-9555
Email: tkasulis@maglaw.com

*Attorneys for Lawrence Billimek*