

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 13, 2024

<u>**VIA CM/ECF**</u>

The Honorable Paul G. Gardephe
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

   Re: *United States v. Lawrence Billimek*, S1 22 Cr. 675 (PGG)

Dear Judge Gardephe:

  The Government respectfully submits this memorandum in connection with the May 20, 2024 sentencing of defendant Lawrence Billimek and in response to the defendant's May 6, 2024 submission ("Def. Mem."). The defendant abused his employer's trust to carry out a multi-year insider trading scheme that reaped tens of millions of dollars of profit that funded his lavish lifestyle, including the purchase of multiple homes. Along the way, he deceived his employer, family, and multiple financial institutions. And it most certainly did not have to be this way—the defendant had a steady career and every opportunity to lead a law-abiding life. But when he was faced with financial difficulties, the defendant chose to orchestrate for the next six years a complex, calculated, insider trading scheme. Owing to the duration and depth of this scheme, the applicable Guidelines range under the United States Sentencing Guidelines is 70 to 87 months' imprisonment, and the United States Probation Office recommends a Guidelines sentence of 70 months' imprisonment. While in his sentencing submission the defendant presents certain mitigation that the Court can and should consider in fashioning the appropriate sentence, this mitigation falls far short of excusing the defendant's conduct or warranting the dramatic variance from this Guidelines range the defendant seeks. As such, and as further detailed below, the Court should sentence the defendant to a significant term of imprisonment consistent with the applicable Guidelines range, recommendation of the Probation Office, and serious nature of the offense.

<h2 style="text-align:center"><u>Background</u></h2>

**I.** **Offense Conduct**

  For over six years, the defendant and his co-conspirator, Alan Williams, executed a complex "front running" insider trading scheme resulting in tens of millions of dollars in profit. (February 29. 2024 Presentence Investigation Report ("PSR") ¶ 12). "Front running" is a particular type of insider trading that involves securities trades based on information an individual acquires regarding a market-moving or anticipated future transaction or the public announcement of news of such a transaction that could impact the price of an asset. (PSR ¶ 11). An individual

with such information could conduct a timely transaction in advance of the news or other trade and profit from the rise or fall of a particular security. (PSR ¶ 11).

The defendant was an insider perfectly positioned to orchestrate such a scheme. He was, during the relevant time period, a senior equity trader at the Teaches Insurance and Annuity Association of America College Retirement Equities Fund's Investment Management ("TCIM"). (PSR ¶ 12). In his role, he was subject to TCIM's code of ethics prohibiting trading on knowledge of TCIM's anticipated transactions. (PSR ¶ 12). Despite this, he, *thousands of times*, abused his insider access to tip Williams on anticipated securities transactions so that Williams could trade on them and share with Billimek with the subsequent profits. (PSR ¶ 12). Total trading profits exceeded $47 million dollars, and the investigation unveiled $12 million in payments from Williams to Billimek in trading proceeds. (PSR ¶ 12). Williams often paid Billimek in checks totaling tens of thousands (or hundreds of thousands) of dollars per check, some of which were written within days of when Williams engaged in profitable intraday trades that closely aligned with the TCIM market-moving transactions. (PSR ¶ 15).

The PSR contains a few examples of the insider trading scheme, evidencing the volume and complexity of the conspiracy. (PSR ¶¶ 17-22). For example, on just one day—August 15, 2022—the conspiracy reaped profits of approximately $55,500 on intraday trading of the stock of Match Group, Inc. ("MTCH"). (PSR ¶ 18). That day, TCIM engaged in substantial selling volume of MTCH. Between 9:28 a.m. and 1:00 p.m., Billimek and Williams exchanged eight phone calls. At 1:40 and 1:56 p.m., Billimek texted Williams. Between 1:42 p.m. and 1:59 p.m., Williams sold short 72,000 MTCH shares for proceeds of approximately $5 million. Then, between 2:01 and 2:46 p.m., Billimek texted Williams ten times. During this time span, TCIM sold over 350,000 shares of MTCH, and Williams purchase 72,000 MTCH shares to cover his short position at a cost of approximately $4.95 million. At 4:08 and 4:09 p.m., Williams and Billimek exchanged additional text messages. This is just but one of thousands of examples of this pattern, five of which are outlined in the PSR.

The contours and brazen nature of the scheme were further spelled out in communications obtained during the investigation. For example, on February 24, 2022, Williams texted Billimek that there "must be problems with txt on other #," an apparent reference to a burner cellphone. (PSR ¶ 23). Billimek then responded "Sell at 9" and Williams confirmed "Flat?" Billimek then texted "Yes flat[.] We got out ok." Based on trading records, Williams engaged in two trades that day "front running" TCIM's trades in the same securities, and one of the securities that Williams sold at Billimek's direction was for an average share price just under the "9" dollars per share instructed by Billimek. The defendant and his co-conspirator also went to great lengths to hide their conspiracy. For example, they used multiple prepaid "burner" phones to communicate regarding trading information and strategy, and communicated over multiple phones on the same day in an effort to obfuscate their criminal conduct. (PSR ¶ 16). And Billimek was well-aware of the criminal nature of his activity. For example, based on a review of the Google search history seized from his phone, on January 17, 2022, after Billimek was denied entry to a TSA pre-check line at the airport, he searched, among other things, "How to know if you are under federal investigation," "how will you know if you are the subject of a criminal investigation," and various other queries related to the revocation of his global entry status. (PSR ¶ 24).

The defendant's apparent motivation was uncovered during the investigation. For example, in an email the defendant sent on August 20, 2016, he bemoaned to the recipient that while he had a "stable job at a growing company," he was "struggling" financially despite living a "no-frills lifestyle" and watching his spending closely. Once the defendant began his insider trading scheme, of course, these concerns evaporated. Instead, Billimek's criminal conduct resulted in massive financial gains. Despite the millions of dollars he stole, for tax years 2020, 2021, and 2022, Billimek reported total wages of between $260,000 and $300,000 per year. (PSR ¶ 107). Billimek reported to the Probation Office that his total monthly expenses were approximately $63,117, totaling over $700,000 per year. (*See* PSR ¶ 94). And, despite his liabilities vastly outpacing his lawful income, Billimek was still able to accrue tremendous assets, reporting to the Probation Office over $17,000,000 in assets. (PSR ¶ 94). Indeed, in connection with his guilty plea, the defendant agreed to forfeit over $12 million in ill-gotten gains, including, as specific forfeitable property, eight different real properties. (PSR ¶ 6). Thus, while Billimek may have claimed that he led a "no-frills" lifestyle before he began his insider trading scheme, that certainly changed once he made millions of dollars in illegal funds. Billimek reported to Probation that he is currently employed as a day trader from his home in New Orleans, Louisiana, and has been since the day after his arrest. (PSR ¶ 79).

The defendant's lying and subterfuge extended to his dealing with several financial institutions. As noted above and in the PSR, Williams often paid Billimek by checks, often within days of Williams's illegal trading. (PSR ¶ 25). At various times, Billimek was asked by his banks for explanations concerning the source of the funds he was depositing. Repeatedly, he lied. For example, in October 2020, Billimek asked Williams to sign an affidavit regarding a $135,000 check Williams had provided, claiming that the funds "are a GIFT from me to Lawrence Billimek and will not need to be repaid." (PSR ¶ 26). Of course, the funds did not need to be repaid—because they were Billimek's share of their insider trading profits. Similarly, in May 2018, Billimek requested a "gift affidavit" from Williams to explain incoming funds that Williams had sent Billimek. (PSR ¶ 27). And in October 2017, Billimek communicated with a mortgage broker about a letter Williams had provided in which Williams claimed he was a "family friend" of Billimek. (PSR ¶ 28). By way of final example, in May 2017, Billimek told another bank that funds from Williams were for payments from Williams for returns on Billimek's investments in restaurants that Williams owned. (PSR ¶ 29).

## II.   The Charges, Guilty Plea, and the Guidelines Calculation

Billimek was charged by a sealed indictment (the "Indictment") filed on December 12, 2022. (Dkt. 1). He was arrested on December 14, 2022. (PSR at p.1). Almost a year later, on November 28, 2023, the defendant pled guilty pursuant to a plea agreement (the "Plea Agreement") to Count 2 of the Indictment, charging him with securities fraud, in violation of Title 15, United States Code, Section 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2. As outlined in the Plea Agreement and also calculated in the PSR, the Guidelines are calculated as follows:

1. The applicable guidelines to the offense charged in Count Two is U.S.S.G. § 2B1.4.

2. Pursuant to U.S.S.G § 2B1.4(a), the base offense level is 8.

3. Pursuant to U.S.S.G §§ 2B1.4(b)(1) and 2B1.1(b)(1)(L), 22 levels are added because the reasonably foreseeable gain resulting from the offense and related conduct was more than $25,000,000 but less than $65,000,000.

4. Pursuant to U.S.S.G. § 3B1.3, 2 levels are added because the defendant used a special skill in a manner that significantly facilitated the commission or concealment of the offense.

5. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of the defendant's intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

6. In accordance with the above, the applicable Guidelines offense level is 29.

The defendant has no known prior convictions, and his Criminal History Category is I. (PSR ¶ 55). Based upon the calculations set forth above, the Guidelines Range applicable to the defendant's conviction is 70 to 87 months' imprisonment. (PSR ¶108). The Probation Office recommends a Guidelines sentence of 70 months' imprisonment. (PSR at p. 35 ("Sentencing Recommendation")). Among other things, the PSR, while noting that this was a first time offense and that the defendant has a strong family and support network, focuses on the nature and circumstances of the offense and the defendant's history and characteristics. (PSR at p. 36). More specifically, the Probation Office notes that the defendant was able to "enrich himself and lavish his family with a high-end lifestyle" through the illegally obtained funds, and expresses concerns over the defendant's forthrightness as to the disclosures of his financial information. (*Id.*). Further, the Probation Office notes that the defendant has a negative cashflow every month—with expenses over $60,000—and that this could increase the defendant's temptation to return to criminal conduct. (*Id.*).

**Discussion**

I. **Applicable Law**

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Thus, the applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005). In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

II. **A Guidelines Sentence Is Warranted In This Case**

A Guidelines sentence of 70 months' imprisonment would be fair and appropriate in this case, given the nature and circumstances of Billimek's offense, the need to impose just punishment and promote respect for the law, and the need for adequate deterrence.

### A.  The Nature and Seriousness Of the Offense and Need for Just Punishment

First, the nature and circumstances of the offense and need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment, all counsel in favor of a sentence within the Guidelines Range.  18 U.S.C. §§ 3553(a)(1), (a)(2)(A).  The insider trading scheme was brazen.  The defendant, on hundreds of occasions, stole information from his employer and provided it to his co-conspirator to trade.  He set up a complex scheme involving burner phones, lies to banks, and carefully timed trades to execute the crime for years, and earned millions of dollars in the process.  The defendant cheated his employer and the market.  This type of conduct erodes the public's trust in the fairness of the securities markets.  And, beyond that, as outlined in the victim-impact letter attached as Exhibit A, the defendant's conduct caused significant harm to his former employer.  The employer outlines both the pecuniary harm suffered, and also, significantly, the less quantifiable, reputational impact.  Among other things, the employer asks the Court to consider sending a "message that employees cannot breach the trust which is essential to their employer's ability to serve clients," exactly as the defendant had done.  And the defendant's harm here is particularly noteworthy because it lasted for so many years and covered thousands of trades.  Put simply, the nature and seriousness of the offense are significant, and speak loudly in favor of a serious sentence in this case.

### B.  General Deterrence

A substantial sentence is required not only to reflect the seriousness of the offense and to provide just punishment, it is also necessary to deter others from similar conduct. 18 U.S.C. § 3553(a)(2)(B). With respect to general deterrence, fraud schemes are difficult to detect and prosecute, especially where, as here, the defendant took steps to obscure and hide his conduct by keeping the conspiracy small and engaging in layers of fraud, including through the use of pre-paid burner phones and through repeated lies to financial institutions.

The legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citing S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259); *see also United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). General deterrence is an important sentencing factor in fraud and white collar cases because the decision to commit fraud is often a calculated cost-benefit decision—as it appears to have been for the defendant in this case. *Martin*, 455 F.3d at 1240 ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quotation marks and citation omitted)); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). In particular, as the Second Circuit and courts in this district have noted, significant sentences are necessary for insider traders who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("As this Court

has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."). Indeed, research shows that enforcement actions and punishment for insider trading is effective for achieving deterrence. *See, e.g.*, Fernan Restrepo, *The Impact of Insider Trading Doctrine on the Incidence of Insider Trading: An Analysis of the Effect of the Misappropriation Theory* (Nov. 8, 2023), https://ssrn.com/abstract=4627327 (finding that the adoption of the misappropriation theory of insider trading had a meaningful deterrent effect); Robert Davidson and Christo Pirinsky, *The Deterrent Effect of Insider Trading Enforcement Actions*, Accounting Review (May 2021) (concluding that insider trading convictions have a statistically significant effect on deterrence of future insider trading).

The defendant argues that the publicity from the prosecution is an adequate deterrent. (Def. Mem. at 22-24). Not so. The Second Circuit has stated that simply because a case has been widely reported on and drawn notoriety does not suggest that imprisonment is not required to promote deterrence:

> [T]he circumstances referred to by the district court do not constitute punishment. The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment." Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment. And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view—i.e., that Freedman's public humiliation and the public nature of his prosecution were punishment enough—would mean that the more flagrant the crime, the less actual statutorily prescribed "punishment" it would require. And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes.

*United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008). In sum, the Court should make clear to all those who may be watching the case—this type of conduct is unacceptable and will be treated as such. A significant sentence is appropriate.

### C. **Specific Deterrence**

With respect to specific deterrence, Billimek's conduct cannot be explained away as an aberration. Indeed, sadly, his conduct was not a one-time occurrence occurring on a single day, but, instead, was a long-term, complex, repeated course of conduct. The defendant professes that he was driven to this conduct by his financial condition—an initial explanation that the Government credits but not one that diminishes the need for specific deterrence here. While the defendant claims that he "will likely never work in the financial services industry ever again" in

claiming that specific deterrence has been "achieved," this conclusory claim is troubling for multiple reasons. (Def. Mem. at 19-20). Most pointedly, the defendant, as reported to the Probation Office, continues to spend tens of thousands of dollars a month; far outpacing his reported income and perhaps trending towards the type of financial troubles that, the defendant claims, prodded him to the criminal conduct in the first place. And the defendant fails to acknowledge what he has been doing since his arrest—day trading at home. (PSR ¶ 79). So, while this may technically not be a job in the "financial services industry," it is most certainly a role that would allow the defendant to again succumb to the temptation of the easy way to profit—through inside information. Indeed, the defendant's own scheme relied on just such a day trader to carry out the trades on the information the defendant provided; in some ways, he is uniquely qualified to recidivate and engage in this conduct again. Thus, the Court should view skeptically the defendant's self-serving claims that he "does not present a risk of committing further crimes." (Def. Mem. at 21). He continues to spend massive amounts of money and continues to participate in day trading activity that could provide him with the motive and the means to return to his criminal ways.

And history teaches that white collar criminals like the defendant are far from immune from recidivating. Indeed, there are many examples of first time white collar criminals in this district who at the time it may have seemed unlikely that they would reoffend, but then become recidivists. *See, e.g.*, *United States v. Franklin Ray*, No. 22 Cr. 228 (AT) (orchestrating a Ponzi scheme after having serving a prior two-year sentence for bank and wire fraud); *United States v. Jonathan Ghertler*, No. 23 Cr. 100 (ER) (investment fraud scheme following over a dozen prior convictions); *United States v. Edward Durante*, No. 15 Cr. 171 (ALC) (beginning new investment fraud scheme while serving a 121 month sentence for fraud); *United States v. Joseph Meli*, No. 19 Cr. 480 (RA) (defendant convicted of participating in a Broadway ticket resale investment fraud scheme after previously serving a 78 month sentence for the same scheme).

And, finally, the Probation Office expressed significant and warranted concern about the defendant's lack of complete candor in explaining his financial status. While the defendant attempts to explain the back-and-forth with the Probation Office in his submission, at minimum, it appears that it took the Probation Office multiple rounds with the defendant to understand the layers of LLCs he had set up to own and sell his real estate holdings.

Thus, for all of the foregoing reasons, a significant term of incarceration is necessary to ensure that this particular defendant does not undertake insider trading or another form of fraud in the future.

### D. **The Guidelines Provide a Useful Framework in this Case**

The Court must also consider "the kinds of sentence and the sentencing range established" in the Guidelines. 18 U.S.C. § 3553(a)(4). The current fraud Guideline is the result of extensive and iterative work by the Sentencing Commission, based on sound policy choices, and the Court should reject the defendant's offer to ignore the Guidelines in this case. (Def. Mem. at 29-32).

"One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and

sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008). "[T]he sentencing guidelines sought to address the inequities of prior sentencing practices that tended to punish white collar economic crimes less severely than other comparable blue collar offenses." *Fishman*, 631 F. Supp. 2d at 403. Over a five-year period between 1996 and 2001, the Commission engaged in a deliberative process to address the Guidelines' treatment of white-collar offenses, with the involvement of relevant stakeholders including the defense bar, the Department of Justice, probation officers, and the U.S. Judicial Conference. *See* Federal Register Notice BAC2210-40, 62 Fed. Reg. 152, 171-74 (1997) (proposals by the Commission for comment regarding economic crime sentencing reform). The Commission explained the resulting amendments, which became effective on November 1, 2001, were based on the determination that "loss serves as a measure of the seriousness of the offense and the defendant's relative culpability." Sentencing Guidelines for the United States Courts, 66 Fed. Reg. 30,512, 30,533 (June 6, 2001). Thus, the 2001 amendments to Section 2B1.1 reflected the considered view of the Commission, following a collaborative process with relevant stakeholders, that loss amount should be a central consideration in determining the seriousness of an offense to which that Guideline applies. Indeed, "[e]ven if the enhancements may lack robust empirical support related to deterrence, they have foundations in empirical data and national experience related to the goals of fair sentencing and retribution." *United States v. Moose*, 893 F.3d 951, 958 (7th Cir. 2018).

In 2002, Congress instructed the Commission to amend the Guidelines for white-collar crime again, this time as part of the Sarbanes-Oxley Act, and in response the Commission amended the modified the loss-amount enhancement in Section 2B1.1 for high-loss cases — that is, cases involving loss amounts in excess of $200 million. *See* U.S. Sentencing Comm'n, Emergency Guidelines Amendments, 15 Fed. Sentencing Reporter 281, 283 (Apr 1, 2003) ("[T]he amendment expands the loss table at §2B1.1(b)(1) to punish adequately offenses that cause catastrophic losses of magnitudes previously unforeseen, such as the serious corporate scandals that gave rise to several portions of the Act."), *available at* 2003 WL 22016909. Thus, to the extent Section 2B1.1 emphasizes loss amount to the degree it does, that was an intentional decision by the Commission based on years of consideration and guidance from Congress. *See Ebbers*, 458 F.3d at 129 ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white collar] crimes.").

Thus, the Guidelines in this case—and, again, the Government is seeking the very bottom of the applicable Guidelines range—provide the Court with an appropriate starting point in fashioning sentence. The defendant's offense resulted in over 40 million dollars in profits; a massive gain. The Guidelines appropriately account for this and should be considered.

### E.  **The Defendant's Submission**

The defendant places significant emphasis on his family, support network, and purported rehabilitation since arrest in seeking leniency from the Court. The Court should of course consider the defendant's personal history and characteristics in fashioning the appropriate sentence, but those factors are not purely mitigating in this case. For starters, as in part discussed above, they demonstrate that the defendant has a strong, loving, support network, and still chose to engage in years of criminal conduct. Thus, the defendant was fortunate to have opportunities many do not; he had a good job and a stable family, and every opportunity to do things the right way. Still, he

chose to turn to years of crime. Relatedly, the defendant's support network—as strong as it appears—did not suffice to keep him from engaging in this criminal conduct, and there is certainly no guarantee it will be able to in the future.

Next, the defendant references, in passing, that he met with the Government after his guilty plea. (Def. Mem. at 15). This, too, merits context. The defendant did meet once with the Government to provide "information" in advance of sentencing. The Government did not understand this to be an "attempt to cooperate with the government," as the defendant now claims, and the information provided by the defendant fell far short of the bare minimum for cooperation. Instead, the information the defendant provided was minimal and general—so much so that it did not provide a single lead that the Government was able to follow. So, while the defendant accurately represents that the Government found him to be credible, this should be given minimal, if any, weight, at sentencing.

Finally, the defendant's submission repeatedly references his desire to "assure financial security for his family" as the motivation for his criminal conduct. (*See, e.g.*, Def. Mem. at 5, 13). This, of course, may have been true—the Government credits that the defendant engaged in years of insider trading for financial gain, in part owing to his desire to provide for his family. But this also belies the reality of the defendant's life over the six years of criminal conduct. He was not engaged in insider trading to help put the bare essentials on the table or pay the mortgage on his spartan family home. <u>Not even close.</u> Instead, the defendant amassed millions of dollars, which he used to buy multiple properties and fund his lavish lifestyle. The investigation revealed that the defendant frequently traveled with his friends and had an active social life. And, as detailed above and in the PSR, he amassed multiple properties and millions of dollars of assets. He could have "assured financial security" for his family with far less money than that which he obtained during the scheme, and his claims that this was the primary motivation for his conduct evidence a troubling inability to accept full responsibility for his crimes and, perhaps, an effort to minimize the nature of his conduct to the Court.

**Conclusion**

  For the reasons set forth above, the Government respectfully submits that a sentence of 70 months' imprisonment is sufficient but not greater than necessary in this case.

                Respectfully submitted,

                DAMIAN WILLIAMS
                United States Attorney

          By: s/ Jason A. Richman
                Jason A. Richman
                Assistant United States Attorney
                (212) 637-2589

Cc:  Defense counsel (by ECF)